IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAUSHANAH MUHAMMAD | : | CIVIL ACTION |
| *on behalf of J.S., a minor child* | : | |
| | : | |
| v. | : | |
| | : | |
| ABINGTON TOWNSHIP POLICE | : | No. 13-716 |
| DEPARTMENT *et al.* | : | |

## MEMORANDUM

**L. Felipe Restrepo, J.**                                                    **August 1, 2014**

 Raushanah Muhammad, on behalf of her son J.S., brings this civil rights action against

the Abington Township police officers involved in her son's 2011 arrest, as well as the Abington

Township police department itself. The defendants have collectively moved for summary

judgment. For the reasons that follow, the motion will be granted.

### I.  BACKGROUND[1]

 This lawsuit arises out of a middle-school fight. In September of 2011, J.S. was an eighth

grader at Abington junior high school. Joint Appendix ("JA") 14. J.S. is African-American and

Muslim. JA 47. At approximately 12:50 p.m. on September 19, as he was leaving the school

lunchroom amid a throng of other students, a Caucasian seventh-grader, B.W., bumped into him.

JA 15-17. J.S. testified that he asked B.W. why he had bumped him, and that B.W. replied "It

doesn't matter." JA 31.

 The two boys started arguing as they entered the school stairwell. It is undisputed that

J.S. followed B.W. up to the third floor, then back down to the second. JA 28, 36. According to

J.S., he continued to request an apology for the bump; in response, B.W. spit in J.S.' face and

said "F you." JA 31. According to Defendant Robert Allmond, an Abington Township police

---

[1] The following facts are undisputed unless otherwise noted.

officer who served as the "School Resource Officer," and who viewed a surveillance videotape of this sequence, J.S. aggressively pursued B.W. up the stairs and cut him off at each floor to yell at him.  JA 71, 153-57.  This portion of the videotape has been overwritten.

The succeeding events, however, are captured on video footage that survives (although the view is partly blocked by the stairwell doors).  As the boys near the second-floor landing, J.S. reaches out to either touch or grab B.W.'s book bag.  B.W. either turns around or is spun around.  B.W. pushes J.S.; J.S. drops his own backpack and swings at B.W.'s face.  The boys begin to fight.  J.S. gets B.W. in a headlock; B.W. wrestles J.S. against the wall.  They both hit and grab at each other and eventually go to the floor – while a befuddled peer looks on from outside the stairwell, apparently weighing the relative risks of proceeding or not proceeding to class.  The fight lasts eighty-two seconds.  JA - Ex. I.

J.S. was twelve years old at the time and approximately 5' 1."  JA 14.  He weighed ninety pounds.  JA - P8, P10.  B.W. appears to have been about the same size.  J.S. left the fight with a swollen lip, cuts on his shoulder and back, and shortness of breath.  JA 32.  He later went to the nurse's office to use his asthma inhaler; he also received ice and band aids.  JA 32, 36.  B.W., in turn, reported to the nurse's office with "pain and bruising to his head and upper torso area."  JA 265, 344.  Later that afternoon, Angelo Berrios, Vice Principal for seventh graders at Abington Junior High, met with B.W., who had been referred from the nurse's office and who recounted his version of the fight.  JA 265-78.  He did not know J.S.' name.  JA 270-71.  Berrios also spoke to B.W.'s mother, who was "highly upset and wanted to explore pressing charges."  JA 319, 324.

The next day, two eighth graders reported to Officer Allmond that J.S. had been involved in a fight with a seventh-grader the day before.  JA 136-37, 140-42.  Allmond contacted Berrios.  JA 143-48.  With the new information, Berrios was able to pinpoint the location of the fight and

2

determine that surveillance video existed for the entire interaction between B.W. and J.S.  JA 278-81.  Berrios reviewed the entirety of the footage with B.W.  JA 292-96.  During that process, Berrios saved the last portion of the footage as an independent file, which is the video that still exists.  The earlier portion of the footage was not saved, and was automatically overwritten a few weeks later.  JA 290, 296-97.

Berrios then summoned J.S. and Allmond to his office.  The record contains differing descriptions of the precise chronology here.  It appears to be undisputed that Allmond viewed the entire video with Berrios and B.W. while J.S. waited outside, after which B.W. left and J.S. was called in.  JA 150-53; JA 18.  Berrios asked J.S. if he had been in a fight; J.S. said that he had. *Id.*  Allmond then arrested him.  JA 18.  According to Berrios, Allmond asked J.S. only one other question – "Is there anything else that you need to report here?" – and J.S. said no.  JA 305.

Berrios and Allmond called Muhammad to explain that her son had been arrested and would need to be picked up at the police station.  JA 179, 308-09.  At the station, after J.S. had been fingerprinted and processed, Muhammad spoke with Allmond before taking J.S. home. JA42-44, 180.  She recounts that Allmond asked about whether her religious community might provide some support to J.S.  JA 44.  Allmond remembers that it was "actually a very pleasant" conversation.  JA 180.

Soon thereafter, Muhammad went to the school to watch the video footage that had been the basis of her son's arrest.  JA 47.  She appears to have seen only the portion that Berrios saved.  *Id.*  She then met with Allmond, Jonathan Kovaleski (the Vice Principal for eighth graders), and possibly Berrios.  *See* JA 46, 316, 331-34.  Muhammad expressed her opinion that the video showed a mutual fight that B.W. started by shoving J.S.; she asked why only her son, and not the white student, had been arrested.  JA 47, 183.  According to Allmond, he told her that

3

it was because "this was not a mutual fight, this was an assault done by her son on a victim who happened to be Caucasian." JA 184. He knew that J.S. was the aggressor because B.W. had told him, and because "it was obvious on the video." JA 184. Muhammad then accused Allmond "of only arresting her son because he was black," at which point Allmond "ended the conversation and stood up:" "I told her that I would not be called a racist and that this conversation was over and to have a nice day and I left the room." JA 183, 187.

Allmond immediately called his supervisor, Detective Sergeant Fink, and reported Muhammad's accusation. JA 187-189, 236. Fink had been trained to document complaints of race discrimination, but in this case, because the complaint was "informal," he undertook an "informal investigation:" He went to the school to watch the video, read Allmond's report, and concurred in his decision to arrest J.S. only. JA 237-38.

Sometime thereafter, Muhammad filed a charge of discrimination against the Abington school district and Abington Junior High School with the Pennsylvania Human Rights Commission ("PHRC"). ECF Doc. 31-3, P-13. On November 16, 2011, she received a call from Fink. According to Muhammad, he said that J.S.' case had just come across his desk, that no formal charges had been filed, and that J.S. was eligible for an alternative disposition called the Youth Aid Panel ("YAP"). JA 50. Muhammad told him that she "would feel more comfortable if he was to speak with [her] representative" from the PHRC, and he said "he would call them immediately." JA 50. When Muhammad later determined that the PHRC had not heard from Fink, she called him back and said that she "felt that this involvement of the police against [her] son was discriminatory." JA 51. She also told him that Allmond had been "very, very rude" and that she wanted to file a formal complaint against him. JA 52. Fink then told Muhammad that "JS would no longer be eligible for the youth panel and that he was going to instruct Officer

Allmond to file the charges."  JA 52.

Fink recorded this interaction in a supplemental police report dated November 22, 2011:[2]

> Right away, Muhammad became very adversarial with me.  I tried to explain the Youth Aid Panel to her, and she refused to communicate with me.  She told me that if I had anything to say to her, that I could go through her Human Relations case worker, Jeremy Burton.  Based on the fact that [J.S.'] mother was not cooperative, I will advise Detective Allmond to file a juvenile petition for [J.S.].

Doc. 31-3, P9-10.  Fink knew before he spoke to Muhammad that she had filed a human relations complaint.  JA 241.

Allmond did submit a juvenile petition for J.S., which instituted a delinquency proceeding.  JA 340-44.  J.S. eventually entered an admission to simple assault and accepted a consent decree.  *Id.*  He has testified that he did not know exactly what he was charged with, but understood that the result was "a record."  JA 28.  The record of the proceeding was later expunged.  *See* Doc. 38, Ex. C.

On February 8, 2013, Muhammad filed this suit on behalf of J.S.  As clarified at oral argument, her complaint asserts four claims:  (1) a selective enforcement claim alleging, pursuant to 42 U.S.C. § 1983, that Allmond and Fink arrested and prosecuted J.S. on the basis of his race and religion in violation of the Fourteenth Amendment; (2) pursuant to § 1983, that Fink violated the First Amendment by retaliating against Muhammad and J.S. for Muhammad's protected speech; (3) pursuant to §§ 1983 and 1985, that Allmond and Fink conspired to violate J.S.' right to equal protection; and (4) pursuant to § 1983 and *Monell*, that the Abington Police

---

[2] The YAP, according to Sgt. Fink, is "an opportunity for juveniles who are residents of the township and who have never been in any kind of trouble before to appear before a panel of community members and explain the case, what happened, and that they would come down with a punishment which they deemed fit.  And if all the terms of the Youth Aid Panel were satisfied that no charges would be filed."  JA 251.

Department, through its custom or policy, caused the violation of J.S.' constitutional rights.[3]
The defendants now move for summary judgment in their favor.

## II.    JURISDICTION AND STANDARD OF REVIEW

Subject-matter jurisdiction lies in this case pursuant to 28 U.S.C. § 1331.  In ruling on a
motion for summary judgment, a court must "construe the evidence in the light most favorable"
to the non-moving party, and grant summary judgment "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law." *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 176 (3d Cir. 2013); Fed. R. Civ. P. 56(a).
"A 'genuine dispute' exists if a reasonable jury could find for the nonmoving party."
*Zimmerman*, 706 F.3d at 176.

## III.    ANALYSIS

### A.  § 1983 Selective Enforcement (Equal Protection) Claim

Section 1983 "provides a federal cause of action for the violation of a federal right."
*Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010).  Discriminatory enforcement of a
facially valid law violates the Equal Protection Clause of the Fourteenth Amendment. *Hill v.
City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).  To prevail on a selective enforcement claim,
a plaintiff must demonstrate that he was treated differently than similarly situated individuals on
the basis of "an unjustifiable standard," such as race or religion.  *Jewish Home of E. Pa. v. Ctrs.
for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) (citation omitted).  "Persons
are similarly situated under the Equal Protection Clause when they are alike in all relevant
aspects." *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (internal quotation marks
and citation omitted).  While a plaintiff must "provide evidence of discriminatory purpose, not

---

[3] J.S.' other claims have been withdrawn. *See* Transcript of Oral Argument held March 10, 2014 ("Tr."),
p. 11-12.

mere unequal treatment or adverse effect," *id.*, it need not be explicit; "[n]ecessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).  In this case, Muhammad alleges that J.S. was treated differently than B.W. because of J.S.' race and religion.

### 1.   *J.S.' Consent Decree as a Bar*

The defendants contend that J.S.' acceptance of a juvenile consent decree precludes him from bringing a selective enforcement claim – first, on the basis of *Heck v. Humphrey*, 512 U.S. 477, 478 (1994), and secondly on the basis of issue preclusion.

### (a)   *Heck v. Humphrey*

The Supreme Court, in *Heck*, confronted "the question [of] whether a state prisoner may challenge the constitutionality of his conviction in a suit for damages under 42 U.S.C. § 1983." 512 U.S. at 478.  The Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87.  Pursuant to *Heck*, courts must dismiss a § 1983 claim that, if successful, would "necessarily imply the invalidity of [the plaintiff's] conviction or sentence," unless the plaintiff can demonstrate that the conviction or sentence "has already been invalidated."  *Id.* at 487.  Here, the defendants argue that the success of J.S.' selective enforcement claim would necessarily imply the invalidity of his consent decree, such that *Heck* bars the claim.  *See Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427, 440-41 (3d Cir. 2005) (holding *Heck* to apply to § 1983 selective enforcement claims because, "if a person can demonstrate that he was subjected to selective enforcement in violation of his Equal

Protection rights, his conviction will be invalid"), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010).

At first blush, *Heck* seems inapposite for the simple reason that a Pennsylvania juvenile consent decree is not a conviction or sentence. Pennsylvania's Juvenile Act, 42 Pa. C.S. § 6301 *et seq.*, provides "programs of supervision, care and rehabilitation," for "children committing delinquent acts," not criminal conviction or punishment. *Id.* § 6301(b)(2); *see also id.* § 6354 ("An order of disposition or other adjudication in a proceeding under this chapter is not a conviction of crime . . ."). Within that framework, the Act provides three avenues for the resolution of a juvenile delinquency proceeding: by informal adjustment, by consent decree, or by a hearing that may result either in an adjudication of delinquency or in dismissal of the petition. *See id.* §§ 6323, 6340, 6336, 6341; *Com. v. J.H.B.*, 760 A.2d 27, 29 (Pa. Super. 2000). Of these, adjudication of delinquency is the closest analogue to conviction. *See, e.g.*, *Com. v. Hughes*, 865 A.2d 761, 795 (Pa. 2004). A consent decree, in contrast, is a mechanism by which the court may "suspend the proceedings, and continue the child under supervision in his own home" with specified conditions. 42 Pa. C.S. § 6340. It is "analogous to the accelerated rehabilitative disposition program available to adults." *Id.; see also Com. v. Wexler*, 431 A.2d 877, 881 (Pa. 1981). A consent decree "does not involve a finding of guilt; instead, the delinquency proceedings are suspended while the juvenile undergoes a period of probation supervision and, assuming successful completion, the petition is dismissed." *Id.* The decree is, literally, the "order of the court continuing the child under supervision." 42 Pa. C.S. § 6340. It does not "me[et] the criteria for a criminal conviction" and cannot be treated as one. *Hughes*, 865 A.2d at 795.[4]

---

[4] *Heck* might also seem inapplicable on the basis that J.S. is not a prisoner with access to a habeas remedy. Although several circuit courts of appeal have read *Heck* to apply only to plaintiffs still in

Matters are complicated, however, by the fact that the Third Circuit has interpreted *Heck* to require a § 1983 plaintiff to "show the prior criminal proceeding terminated in his favor." *Gilles v. Davis*, 427 F.3d 197, 209 (3d Cir. 2005).  Applying that rule, *Gilles* held that *Heck* barred the § 1983 First Amendment claims of a plaintiff whose underlying criminal charge had been resolved through an Accelerated Rehabilitation Disposition ("ARD"), because "the ARD program is not a favorable termination under *Heck*." *Id.* at 211.  The defendants in this case argue that *Gilles* compels the application of *Heck* here, because J.S.' delinquency proceeding was the juvenile analogue of a criminal proceeding, and his consent decree the analogue of an adult ARD.

There are reasons to think that *Gilles* may no longer be good law.  In the first place, *Heck* itself did not require a § 1983 plaintiff to demonstrate a favorable termination of his underlying criminal proceedings (rather, "favorable termination of his available state, or federal habeas, opportunities to *challenge* the underlying *conviction or sentence*").  *Muhammad v. Close*, 540 U.S. 749, 751 (2004) (describing *Heck*) (emphasis added).  *Gilles* extrapolated from *Heck*'s discussion of the criteria for a malicious prosecution claim, which the *Heck* Court invoked as an analogy to assist in its interpretation of two federal statutes – the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the federal habeas corpus statute, 28 U.S.C. § 2254.  *See* 512 U.S. at 484; *id.* n.4.  *Heck*'s holding – prohibiting § 1983 claims that would invalidate an outstanding criminal judgment – does not include the language of "favorable termination."

Secondly:  Two years after *Gilles* the Supreme Court decided *Wallace v. Kato*, 549 U.S. 384 (2007), which clarified that *Heck* applies "only when there exists a conviction or sentence

custody (especially after *Spencer v. Kemna*, 523 U.S. 1 (1998)), the Third Circuit has rejected that reading.  *See, e.g.*, *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 639 (6th Cir. 2008) (citing, *inter alia*, *Gilles v. Davis*, 427 F.3d 197, 210 (3d Cir. 2005)); *see also Gilles*, 427 F.3d at 217 (Fuentes, J., dissenting on this issue).

that has not been invalidated, that is to say, an outstanding criminal judgment" or an "extant conviction," not an "anticipated future conviction." *Id.* at 393 (internal quotation marks and alterations omitted). *Heck* does not bar suit when "there [i]s in existence no criminal conviction that the cause of action would impugn." *Id.; see also Magana v. Cnty. of San Diego*, 835 F. Supp. 2d 906, 910 (S.D. Cal. 2011) ("The Supreme Court recently noted that an existence of an actual conviction is a condition *sine qua non* for the application of the *Heck* bar."). A § 1983 plaintiff may bring suit while criminal proceedings are ongoing, before any conviction – or other disposition – has occurred. *Wallace* thus eliminated any possible reading of *Heck* as requiring "favorable termination" of the underlying criminal proceedings, because it clarified that *Heck* does not require termination at all. This clearly distinguishes the *Heck* bar from the requirements for a malicious prosecution claim. *Cf.* Restatement (Second) of Torts § 653 (1977) (including, as element of malicious prosecution claim, proof that "the proceedings have terminated in favor of the accused").

Following *Wallace*, the Tenth and Eleventh Circuits have found *Heck* inapplicable where a plaintiff's underlying criminal proceeding was resolved through a pre-trial diversion program. *See McClish v. Nugent*, 483 F.3d 1231 (11th Cir. 2007); *Vasquez Arroyo v. Starks*, 589 F.3d 1091 (10th Cir. 2009). As the Eleventh Circuit wrote,

> The issue is not . . . whether Holmberg's participation in PTI amounted to a favorable termination on the merits. Instead, the question is an antecedent one— whether *Heck* applies at all since Holmberg was never convicted of any crime. . . . Holmberg's § 1983 suit does not represent the sort of collateral attack foreclosed by *Heck* for the straightforward reason that it is not collateral to anything—the § 1983/habeas conflict addressed in *Heck* is nonexistent when, as here, there was never a conviction in the first place.

483 F.3d at 1251; *see also* 589 F.3d at 1096 (concluding "that the Kansas pre-trial diversion agreements are not outstanding convictions and therefore these § 1983 claims impugning their

validity are not barred by *Heck*").[5]

The Third Circuit has not reconsidered *Gilles* in light of *Wallace*.  It has applied *Gilles* in several non-precedential opinions.  *See Bukovinsky v. Pennsylvania*, 455 F. App'x 163, 166 (3d Cir. 2011); *Fernandez v. City of Elizabeth*, 468 F. App'x 150, 154-55 (3d Cir. 2012); *Deemer v. Beard*, 557 F. App'x 162, 166 (3d Cir. 2014).  These decisions, however, do not constitute precedential authority and are, at the least, in tension with *Wallace*.  *Compare Wallace*, 549 U.S. at 393 (holding that "extant conviction" is prerequisite for *Heck* bar), *with Fernandez*, 468 F. App'x at 154 (holding that "[c]onvictions are not the critical prerequisite" for *Heck* bar).

On the other hand, the Third Circuit has recognized the effect of *Wallace* in its more immediate context.  Before *Wallace*, the Third Circuit had interpreted *Heck* to bar claims that could invalidate a potential future conviction on a pending charge.  It has since confirmed that the *Wallace* rule – that *Heck* applies only whether there is an "existing criminal conviction" – "supplanted" its prior jurisprudence on this point.  *Dique v. New Jersey State Police*, 603 F.3d 181, 187-188 (3d Cir. 2010).  Finally, in a precedential decision that post-dates *Wallace*, the Third Circuit acknowledged in a footnote that the *Heck* bar *is* distinct from the "favorable termination" requirement for malicious prosecution claims:  "We do not need to apply *Heck*'s test in the present case because when a malicious prosecution claim is brought under § 1983, it is barred simply for lack of favorable termination."  *Kossler v. Crisanti*, 564 F.3d 181, 199 n.6 (3d Cir. 2009).  This language, implying that other § 1983 claims are *not* "barred simply for lack of favorable termination," appears to conflict with *Gilles* and aligns with the Tenth and Eleventh

---

[5] *See also Hendrix v. City of Trenton*, 2009 WL 5205996, at *4 n.2 (D. N.J. Dec. 29, 2009) (noting disagreement among circuits on question of whether diversion resolution triggers *Heck* bar); *Magana*, 835 F.Supp.2d. at 911 (holding that, where plaintiff "received informal supervision that culminated in the dismissal of all charges against him in the juvenile court," "*Heck* is inapposite and the *Heck* bar does not even come into play").

Circuits, as well as *Heck* and *Wallace*.  If the *Kossler* footnote represents the state of Third Circuit law, *Heck* does not apply in the case at bar, because J.S. was never convicted or sentenced for any crime.  But the footnote is dicta, and does not express a considered decision of the Third Circuit to overrule *Gilles* or recognize its abrogation.  In the absence of such a statement, *Gilles* arguably remains binding authority.

On a close reading, however, *Gilles* is more limited than it first appears.  It actually interpreted *Heck* to have held that "a § 1983 *malicious prosecution* claim was subject to the common law requirement that the plaintiff show the prior criminal proceeding terminated in his favor."  427 F.3d at 209 (emphasis added).[6]  *Gilles* then applied this requirement on the basis that the plaintiff's § 1983 claim "sound[ed] in malicious prosecution:"  It required him to demonstrate his innocence of the underlying charge.  *Id.*  This was also true in the cases that *Gilles* invoked as support.  *See Roesch v. Otarola*, 980 F.2d 850, 851 (2d Cir. 1992); *Singleton v. City of New York,* 632 F.2d 185, 193-95 (2d Cir. 1980); *Taylor v. Gregg,* 36 F.3d 453, 455-56 (5th Cir. 1994).  One of these explicitly recognized that the favorable-termination requirement would not be relevant to all § 1983 claims.  *See Roesch*, 980 F.2d at 854 ("We need not decide what violations of due process, not turning solely on lack of probable cause, might permit a section 1983 remedy for state misconduct during the course of a criminal proceeding that did not terminate in favor of the section 1983 plaintiff…").  The reasoning and holding of *Gilles* thus appear limited to § 1983 claims that, like malicious prosecution, hinge on the plaintiff's innocence of the criminal charge.

J.S.' selective enforcement claim does not.  He does not contest probable cause for his arrest; his claim is only that he and B.W. were treated differently for impermissible reasons.  *Cf.*

---

[6] The § 1983 claims in *Heck* were not for malicious prosecution; they were for alleged violations of due process and the Fourth Amendment.  *See* 512 U.S. at 479.

*United States v. Armstrong,* 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."). *Gilles* did not consider a § 1983 claim of this ilk, and its reasoning does not apply.

In sum: The Supreme Court has clearly held that *Heck* bars only those claims that would invalidate an existing conviction, and there is no conviction here. Furthermore, the reasoning of *Gilles* (to the extent it remains good law) is limited to § 1983 claims that contest probable cause for an underlying criminal charge, which J.S.' claim does not. For these reasons, I conclude that *Heck* does not bar J.S.' selective enforcement claim.

(b) <u>Issue Preclusion (Collateral Estoppel)</u>

Secondly, the defendants argue that J.S.' admission in the juvenile proceeding estops him from claiming that the fight was mutual, and thus precludes his claim that he and B.W. were similarly situated. The offense to which J.S. admitted, 18 Pa. C.S. § 2701(a)(1), consists of "attempt[ing] to cause or intentionally, knowingly or recklessly caus[ing] bodily injury to another." "Simple assault is a misdemeanor of the second degree unless committed . . . in a fight or scuffle entered into by mutual consent, in which case it is a misdemeanor of the third degree." *Id.* § 2701(b)(1). J.S. admitted to simple assault as a misdemeanor of the second degree ("M2"). JA 340; Doc. 40-1, p.5. The defendants argue that this establishes that the fight was not entered into by mutual consent.

"[T]he preclusive effects of prior cases are determined by the law of the prior forum." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 145 (3d Cir. 1999); *see also Heck*, 512 U.S. at 480 n.2 ("The res judicata effect of state-court decisions in § 1983 actions is a matter of state law."). Under Pennsylvania law, issue preclusion applies when

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50-51 (Pa. 2005).  In this case there is no dispute that J.S. was a party to the prior proceeding.  The difficult questions are whether J.S.' delinquency proceeding "resulted in a final judgment on the merits," whether he had "a full and fair opportunity to litigate the issue" of mutual consent, whether that issue was "decided" in the prior proceeding and, if so, whether it was "essential" to the judgment.  Where there is no authoritative Pennsylvania precedent on point, I must predict how the Pennsylvania Supreme Court would rule, giving "due regard, but not conclusive effect, to the decisional law of lower state courts."  *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000).

A consent decree is not a judgment on the merits.  It binds the parties with the force of a final judgment, and is a final disposition in a delinquency proceeding, but "is not a legal determination by the court of the matters in controversy."  *Zampetti v. Cavanaugh*, 176 A.2d 906, 909 (Pa. 1962); *Wexler*, 431 A.2d at 881; *In Interest of John W.*, 446 A.2d 621, 623 (Pa. Super. 1982).  As contemplated by the Juvenile Act, a consent decree is a procedural order suspending proceedings and placing the child under home supervision.  *See* 42 Pa.C.S. § 6340; *Hughes*, 865 A.2d at 795.  It does not require or necessarily entail any finding of culpability.  *Id.*

In this case, however, the consent decree was accompanied by J.S.' admission to an M2 simple assault, which the juvenile court accepted.  *See* Doc. 40-1, p. 5-8; Doc. 38, Exs. B & C. The question is thus whether a formal admission, followed by a juvenile consent decree, constitutes a "final judgment on the merits."  One court in this district has held that it does.  *See Ehly v. City of Philadelphia*, No. 03-3634, 2004 WL 2583818, at *2-3 (E.D. Pa. Nov. 9, 2004).  I

14

agree.  The entry of an admission is an alternative to a judicial determination, beyond a reasonable doubt, of whether the child committed the offense alleged.  *See* 42 Pa. C.S. § 6341. The Pennsylvania Superior Court has held that an admission is "the juvenile equivalent of a guilty plea," and a "critical stage [of the delinquency proceeding] at which a respondent must be afforded the right to counsel."  *In re A.M.*, 766 A.2d 1263, 1264 (Pa. Super. Ct. 2001).  It is difficult to escape the conclusion that, by accepting and incorporating J.S.' admission into its consent decree, the juvenile court made a final judgment on the merits that J.S. committed M2 simple assault.

The additional wrinkle is that J.S.' juvenile record was later expunged.  *See* Doc. 38 Ex. C.; *see also* 18 Pa. C.S. § 9123.  The parties have not provided any authority exploring the issue-preclusive effect of an *expunged* juvenile admission and consent decree in Pennsylvania, and research has uncovered none.  Given the nature of expungement, however, there is no basis to conclude that it alters the issue-preclusion analysis.  "In general terms, expungement is simply the removal of information so that there is no trace or indication that such information existed." *Hunt v. Pennsylvania State Police*, 983 A.2d 627, 633 (Pa. 2009); *see also* 18 Pa. C.S. § 9102 (defining expungement); *id.* § 9122-23 (enumerating criteria and procedures for expungement). The provisions governing judicial expungement in Pennsylvania do not suggest that it voids the records that it erases; the process appears designed, rather, to make them invisible to the public at large.  *See* 18 Pa. C.S. § 9122(c) (requiring certain criminal justice actors to maintain information regarding expunged offenses, to be used for limited purposes).  The judicial expungement of J.S.' admission and consent decree does not change the conclusion that, together, they constituted a final judgment on the merits.

J.S. also had a "full and fair opportunity" to litigate the issue of mutual consent in his delinquency proceeding.  In making this determination, Pennsylvania courts consider, *inter alia*, the stakes of the prior proceeding, the formality of its procedures and the circumstances of the adjudication.  *See, e.g.*, *City of Philadelphia v. W.C.A.B. (Porter)*, 2012 WL 8704347, at *2-3 (Pa. Cmwlth. July 9, 2012) (citing *Cohen v. W.C.A.B. (City of Philadelphia)*, 909 A.2d 1261 (Pa. 2006)); *Dep't of Corr. v. W.C.A.B. (Wagner-Stover)*, 6 A.3d 603, 613 (Pa. Cmwlth. 2010); *see also Carrasca v. Pomeroy*, 313 F.3d 828, 835 (3d Cir. 2002) (suggesting that preclusive effect of Pennsylvania guilty plea to summary offense depends on circumstances of plea).[7]  The Third Circuit, applying Pennsylvania issue-preclusion law, has also held that "[a] party has been denied a full and fair opportunity to litigate only when state procedures fall below the minimum requirements of due process as defined by federal law."  *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1074 (3d Cir. 1990).

Delinquency proceedings are less formal than adult criminal proceedings, but still entail significant constitutional procedural protections, including the right to counsel.  *See, e.g.*, *In re Gault*, 387 U.S. 1 (1967); 42 Pa. C.S. § 6331 *et seq.*  In his own proceeding, J.S. appeared in court and was represented by counsel.  Muhammad has not argued that J.S. was denied due process.  The outcome of the proceeding was important to both J.S. and his mother, and she had already complained that he and B.W. were equally culpable for the fight.  J.S. (through his counsel) could have argued that he had committed only an M3 simple assault.  There is nothing in the record suggesting that he did not have a full and fair opportunity to do so.

---

[7] Although New Jersey exempts convictions for non-indictable offenses from having issue-preclusive effect, Pennsylvania, so far as I can ascertain, does not.  *See id.; see also Anela v. City of Wildwood*, 790 F.2d 1063, 1068 (3d Cir. 1986) (citing *Matter of Tanelli*, 477 A.2d 394 (N.J. Super. Ct. 1984)); *M.B. ex rel. T.B. v. City of Philadelphia*, 128 F. App'x 217, 226 (3d Cir. 2005) (registering "serious doubts" about applicability of *Anela* to Pennsylvania guilty pleas).

The outcome of this analysis would be different if federal common law applied, because it bars re-litigation only of those issues that were "actually litigated" in a prior proceeding, and both the Supreme Court and Third Circuit have suggested that a guilty plea does not constitute actual litigation.  *See Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007) (articulating federal issue-preclusion test); *Haring v. Prosise*, 462 U.S. 306, 316 (1983) (noting that "no issue was 'actually litigated' in the state proceeding since Prosise declined to contest his guilt in any way"); *Carrasca*, 313 F.3d at 835 ("[T]he Supreme Court has recognized that there are a number of reasons why a defendant would plead guilty when the issues were not litigated.").  Uncertainty arises in this case because the Pennsylvania Supreme Court has occasionally cited the "actually litigated" language in explaining Pennsylvania issue preclusion.  *See, e.g.*, *Hebden v. W.C.A.B. (Bethenergy Mines, Inc.)*, 632 A.2d 1302, 1304 (Pa. 1993); *City of Pittsburgh v. Zoning Board of Adjustment of Pittsburgh*, 559 A.2d 896, 901 (Pa. 1989); *Clark v. Troutman*, 502 A.2d 137, 139 (Pa. 1985).  Because the more recent Pennsylvania Supreme Court and intermediate-court decisions have used the "full and fair opportunity" test, however, and because the Third Circuit has held that this is a question of procedural opportunity, the "actually litigated" requirement does not appear to apply.

Finally, the M2 grading of the offense on J.S.' colloquy form did decide the question of whether the fight was entered into by mutual consent, and that determination was essential to the judgment.  The simple assault statute, 18 Pa. C.S. § 2701, provides that a simple assault committed in a mutual fight is a misdemeanor of the third degree ("M3").  *Id.* § 2701(b).  For a person to be sentenced for M2 simple assault, either a judge or jury must determine that the assault was *not* committed during a mutual fight.  *See Com. v. Norley*, 55 A.3d 526, 531 (Pa. Super. 2012) (holding that offense grading is a sentencing decision for the judge); Pa. Suggested

17

Standard Jury Instructions (Criminal), § 15.2701F (2nd ed. 2012) (instructing jurors that, to convict on simple assault as a misdemeanor in the second degree, "you must be satisfied beyond a reasonable doubt that the fighting involved here did not begin by mutual consent").  J.S.' admission to M2 simple assault therefore included an admission that the fight was not mutual.

Because J.S. had a full and fair opportunity to litigate this issue, which was essential to the state court's acceptance of his admission to M2 simple assault, the admission precludes J.S. from claiming in this suit that his fight with B.W. was entered into by mutual consent.[8]

(c)  Disputed Material Facts

Given that J.S. is barred from claiming that he and B.W. were mutually responsible for the fight, the record in this case – construed as favorably as possible to J.S. – cannot support a finding that he and B.W. were "similarly situated" with respect to possible arrest.  The record establishes that B.W. did not start the fight:  It is uncontested that he bumped J.S. by accident, that J.S. nonetheless followed him up three flights of stairs and down one, and that J.S. initiated contact on the second-floor landing.  On those facts a jury cannot find that B.W. started the fight even if it finds all of J.S.' testimony to be true.  Nor can J.S. claim that the fight was mutual.  The only possible conclusion for the jury to reach is that J.S. started the fight.  This means that there was a reason for Allmond to treat him differently than B.W., and that the two boys were not "alike in all relevant aspects."  *Startzell*, 533 F.3d at 203.

Were it not for J.S.' admission to M2 simple assault, things might be different.  The surviving video clip shows two boys tussling in a stairwell, not an obvious "attacker" and "victim," and a reasonable jury could conclude that there was no good reason to arrest either boy.

---

[8] The defendants also invoke the narrative in Allmond's affidavit of probable cause, but it is irrelevant. J.S. admitted to an offense, not to the affidavit.  *Cf. Descamps v. United States*, 133 S. Ct. 2276, 2289 (2013) ("The meaning of those documents [used in plea colloquys] will often be uncertain.  And the statements of fact in them may be downright wrong.  A defendant, after all, often has little incentive to contest facts that are not elements of the charged offense . . .").

But because J.S., by operation of collateral estoppel, cannot claim that he and B.W. were similarly situated, there is no genuine dispute as to any material fact:  As a matter of law, his claim must fail.

On the religious discrimination claim, summary judgment is warranted for the further reason that the record is devoid of evidence that Allmond knew J.S.' religion prior to his arrest, or knew B.W.'s religion at any point.  Muhammad argues that Allmond's comment about J.S.' "religious community" at the police station indicates prior knowledge of his religion, but the far more likely explanation is that Allmond drew an inference from Muhammad's own religious garb.  *See* Tr. 7.  In any event, this fact alone is not adequate to support a finding that Allmond or Fink intentionally discriminated against J.S. on the basis of his religion.[9]

### B.  § 1983 First Amendment Retaliation Claim

"In order to establish a First Amendment retaliation claim, a plaintiff must prove (1) that [s/]he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."  *George v. Rehiel*, 738 F.3d 562, 585 (3d Cir. 2013) (internal quotation marks and citation omitted).  In this case, the alleged retaliation is Fisk's decision to withdraw the YAP option and instruct Allmond to file a juvenile petition after Mohammad told him on the phone that she wished to file a formal complaint against Allmond.  *See* J.A. 52.  "The test in our Circuit for determining whether an action is treated as retaliation is whether it is 'sufficient to deter a person of ordinary firmness from

---

[9] There is no need to reach the defendants' qualified immunity argument as to this claim, but I note that qualified immunity would not apply.  The defendants do not contest the fact that to punish one child more severely than another because of his race or religion would violate a clearly established right to equal protection of the laws.  Their defense is, instead, that they did not act with such motive.  An "I didn't do it" defense "is not cognizable as a declaration of qualified immunity."  *Giuffre v. Bissell*, 31 F.3d 1241, 1258-59 (3d Cir. 1994) (citing, *inter alia*, *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991), *cert. denied*, 502 U.S. 1121 (1992) ("[T]here is no separate 'right not to be tried' on the question whether the defendants did the deeds alleged; that is precisely the question for trial.")).

exercising his constitutional rights.'"  *Miller v. Mitchell*, 598 F.3d 139, 152 (3d Cir. 2010)

(quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).  The withdrawal of a diversion

opportunity and institution of delinquency proceedings against Muhammad's son clearly meet

this test, and the defendants do not argue otherwise.

They contend, rather, that the claim is barred because, pursuant to *Hartman v. Moore*,

547 U.S. 250, 266 (2006), "plaintiffs bringing retaliatory prosecution claims must allege and

prove lack of probable cause as an element of causation," which J.S. cannot do.  *Miller*, 598 F.3d

at 154 (citing *Hartman*, 547 U.S. at 252).  Although there are arguments for limiting *Hartman*'s

application, the Third Circuit has applied *Hartman* in the context of juvenile delinquency

proceedings, and it is the current rule.  *See id.*  At the least, therefore, defendants are entitled to

qualified immunity on the First Amendment claim to the extent it is a claim of retaliatory

prosecution.  Given the state of the law, a reasonable officer in Fink's position would not have

known that filing a petition against J.S., supported by probable cause, could violate the First

Amendment – even if he did so in order to retaliate.

If the claim is cast as alleging a retaliatory withdrawal of the YAP program rather than

retaliatory prosecution, the issue is not so clear, because the law is well settled that the

government cannot deny or withdraw a benefit in retaliation for protected speech.  As the

Supreme Court wrote in 1972:

> For at least a quarter-century, this Court has made clear that even though a person
> has no 'right' to a valuable governmental benefit and even though the government
> may deny him the benefit for any number of reasons, there are some reasons upon
> which the government may not rely.  It may not deny a benefit to a person on a
> basis that infringes his constitutionally protected interests—especially, his interest
> in freedom of speech.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  The Court reaffirmed that rule in 2013:  "We

have said in a variety of contexts that 'the government may not deny a benefit to a person

20

because he exercises a constitutional right.'"  *Koontz v. St. Johns River Water Mgmt. Dist.*, 133

S. Ct. 2586, 2594 (2013) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S.

540, 545 (1983)).

It is not apparent, however, that the YAP program qualifies as a government "benefit" for

purposes of this doctrine.  As the Supreme Court noted in *Perry*, it has prohibited retaliatory

denials of tax exemptions, unemployment benefits, welfare payments, and public employment.

*Perry*, 408 U.S. at 597.  Muhammad has not offered any example of a court applying the *Perry*

doctrine to a pre-trial diversion program, and neither the Supreme Court nor the Third Circuit has

considered whether such a program constitutes a "benefit" in this context.  Furthermore,

although the YAP program is certainly beneficial, the denial of access to the program is

inseparable from the institution of delinquency proceedings.  It would be an odd result if

*Hartman* allowed retaliatory prosecution (supported by probable cause) but prohibited retaliatory

exclusion from diversion programs, which amounts to the same thing.

This is not to say that the law should sanction retaliatory decisions about diversion

eligibility.  Against the current First Amendment landscape, however, Fink's decision to deny

J.S. access to the YAP program "did not violate clearly established law."  *Pearson v. Callahan*,

555 U.S. 223, 243 (2009).  For that reason, he is entitled to qualified immunity on this claim.

*See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) ("Qualified immunity shields government

officials from civil damages liability unless the official violated a statutory or constitutional right

that was clearly established at the time of the challenged conduct.").  I will therefore grant

summary judgment in his favor.

### C.  Remaining Claims: §§ 1983 & 1985(3) Conspiracy, *Monell*

In his remaining claims, J.S. alleges that Allmond and Fink conspired to violate J.S.'

right to equal protection, and that the Abington Police Department, through its custom or policy, caused the violation of J.S.' constitutional rights.  All of these claims require J.S. to prove an underlying constitutional deprivation.  *See* 42 U.S.C. § 1983 (creating liability for the "deprivation" of constitutional rights to the party "injured" by the deprivation); *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971) (noting that, to prevail on § 1985(3) claim, plaintiff must show that s/he was "'injured in [his/her] person or property' or 'deprived of having and exercising any right or privilege of a citizen of the United States'") (quoting 42 U.S.C. § 1985(3)); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue.") (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)).  Because J.S. cannot prove an underlying constitutional violation, his conspiracy and *Monell* claims are barred as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted.  An implementing order follows.

22